Grevemberg et als. vs. Bradford.

## No. 10,916.

### LOUIS GREVEMBERG ET ALS. VS. JAMES L. BRADFORD.

1. A purchaser at a judicial sale is not bound to look beyond the decree recognizing its necessity. The jurisdiction of the court is an essential inquiry, but the *truth* of the record concerning matters within its jurisdiction can not be disputed.

2. A purchaser under a decree of a probate court is bound to look to the jurisdiction of the court granting the order of sale. Such order is to be received as conclusive, and is not to be impeached from *within,* but it is impeachable from *without.*

3. A judgment, sentence, order or decree passed by a competent jurisdiction' which creates or changes a title, or any interest in an estate, is not only final as to the parties themselves and all claiming under them, but furnishes conclusive evidence *to all mankind* that the right or interest belongs to the party to whom the court adjudges it.

Grevemberg et als. vs. Bradford.

A PPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*Rouse & Grant* for Plaintiffs and Appellees:

The holder of a certificate of location, or land scrip, issued in favor of "E. B or her legal representatives," holds it subject to inquiry, in a court of justice as to the person to whom it should inure. Hogan vs. Page, 2 Wall. 605.

2. Neither such holder nor any assignee can avoid liability to the true owner by locating the scrip upon and converting it into land, and taking a patent in his own name, The owner of the scrip may recover the land from the locator. Brush vs. Ware, 15 Pet. 93; Reeder vs. Barr, 4 Ohio, 446.

3. Even a grantee from the locator is liable to the owner of the scrip for the lands located, if the patent contain recitals leading back to a holder of the scrip who had no title. Weeks vs. Railroad Co., 47 N. W. R. 757; 78 Wis. 51; Walker vs. Daily, 49 N. W. R. 812; Hardy vs. Harbin, 4 Sawyer, 536; Reeder vs. Barr, 4 Ohio, 446.

4. Neither the act of Congress of June 2, 1858, authorizing the issue of scrip by the Surveyor General in satisfaction of confirmed private land claims, nor the act of January 28, 1879, regulating the assignment of scrip after issue, empower the Surveyor General or other executive officer to decide who are the legal representatives of the confirmee. Even if empowered to decide questions of fact, the decisions of such officers on questions of law, such as the jurisdiction of a Louisiana court, would be subject to inquiry in the courts. Johnson vs. Towsley, 13 Wall. 72-87; Meader vs. Norton, 11 Wall. 442; Stark vs. Starrs, 6 Wall. 402; Widdicombe vs. Childers, 124 U. S. 400, and cases there cited (p. 405).

5. A suit to recover lands so patented does not attack the patent. Silver vs. Ladd, 7 Wall. 219-228.

6. The holder of such lands is liable as constructive trustee, or *negotiorum gestor*, to one having antecedent rights to such lands, or the scrip with which the same was located. Brush vs. Ware, 15 Pet. 93; Weeks vs. Railroad, 47 N. W. R. 757; 78 Wis. 51; Walker vs. Daly, 49 N. W. R. 812; Hardy vs. Harbin, 4 Sawyer, 536; Reeder vs. Barr, 4 Ohio, 446; Johnson vs. Towsley, 13 Wall. 72; Meader vs. Norton, 11 Wall. 442; Stark vs. Starrs, 6 Wall. 402; Widdicombe vs. Childers, 124 U. S. 400; Silver vs. Ladd, 7 Wall. 219; Civil Code, Arts. 2295-2298.

7. In a court of limited and inferior jurisdiction, or a court of general jurisdiction acting under a special authority, each step is jurisdictional as to each subsequent step, and the record must show that it was taken in the proper order. Galpin vs. Page, 18 Wall. 350; Crepps vs. Durden, 1 Sm. Head. Cas., note 978; Thatcher vs. Powell, 6 Wheat. 119; Elliott vs. Piersol, 1 Pet. 328; Williamson vs. Berry, 8 How. 495; Gaines vs. Delacroix, 6 Wall. 720; Donaldson vs. Hull, 7 Martin, N. S. 112; Elliott vs. Labarre, 2 La. 326; Shelby vs. Bacon, 10 How. 56.

8. Before and after the Constitution of 1868, probate courts in Louisiana were courts of special, limited and inferior jurisdiction. O'Donegan vs. Knox, 11 La. 384; Lepage vs. N. O. Gas Light and B. Co., 7 Rob. 183; Const. 1868, Arts. 87 and 91; C. P., Art. 925; Case of Lettrius Alrio, 13 Copp's Land Owner, 178; Case of John Shafer, Ibid. 236; Case of Stephen Swazey, 14 Ibid. 82.

9. Act No. 87 of March 5, 1870, creating office of Public Administrator, repealed Art. 1190 C. C., and Sec. 3691 R. S., and gave heirs of vacant estates a year in which to present themselves before their property could be sold. Succession of Winn, 25 An. 216.

26

10. If those provisions of law were not so repealed, they were special legislation, and the record of proceedings under them must show upon its face, under pain of nullity, that all required steps were taken. Thatcher vs. Powell, *supra;* Shelby vs. Bacon, *supra;* Elliott vs. Piersol, *supra;* Elliott vs. Labarre, *supra.*

11. The words " in a summary manner," in those provisions, mean speedily and diligently, according to law, and do not dispense with notice, either of application for administration or of sale. Love vs. Banks, 3 La. 480; Succession of Porter, 5 Rob. 96; Caldwell et al. vs. Glen, 6 Rob. 9; Succession of Curley, 18 An. 728.

12. Notice of application for administration is jurisdictional, and can not be dispensed with. Elkins vs. Canfield, 5 Martin, N. S. 505; Bernard vs. Vignaud, 1 Martin, N. S. 1; Psyche vs. Paradol, 6 La. 366; Baldwin vs. Carlton, 11 Rob. 109; Girod vs. Girod, 18 La. 394; King vs. Lastrapes, 13 An. 582; Succession of Henderson, 2 Rob. 391; Succession of Talbert, 16 An. 230; Succession of Phelan, 20 An. 255; Succession of Guzman, 35 An. 404; Pfarr & Kullman et al. vs. Belmont, 39 An. 294; The Mary, 9 Cr. 126; Bradstreet vs. Neptune Insurance Co., 3 Sum. 599; Gillett vs. Needham, 37 Mich. 143; Breen vs. Pangborn, 51 Mich. 29; Thatcher vs. Powell, *supra.*

13. If the record shows no debts the proceedings are void. Burns vs. Van Loan, 29 An. 562; Burton and Wife vs. Brugier and Sheriff, 30 An. 478; Farrar vs. Dean, 24 Mo. 16.

14. A sale by the public administrator to one who acts as his attorney is void. C. C. 1146; Byrd vs. McMicken, 8 M. N. S. 165; McCarthy vs. Bond's Admr., 9 La. 355; Neda vs. Fontenot et al., 2 La. 781; Harrod vs. Norris. 11 M. 297; Succession of White, 9 An. 232.

15. A judicial sale or other proceeding may be attacked collaterally by disproof of jurisdictional facts, such as domicil or vacancy of the estate, though the record may be perfect. Pasteur et al. vs. Lewis & Lynd, 39 An. 7-8; Beauregard vs. Lampton, 33 An. 827; Miltenberger vs. Knox, 21 An. 399; Beale vs Walden, 11 Rob. 72; Clements vs. Comfort, 26 An. 270; O'Donegan vs. Knox, 11 La. 384; Beckham vs. Henderson, 23 An. 446; Thompson vs. Whitman, 18 Wall. 457; Simmons vs. Saul, 138 U. S. 448.

16. If it appears that any debts of decedent would have been prescribed, the heirs may avail themselves of the prescription and impeach a probate sale, collaterally, though the administrator did not] plead it. C. C. 3466; McCoy vs. Morrow, 18 Ill. 519; Longworthy's Heirs vs. Baker, 23 Ill. 484; Rosenthal vs. Renick, 44 Ill' 204; Gore vs. Brazier, 3 Mass. 542; Wyman vs. Bigden, 4 Mass. 155; Sumner vs. Child, 2 Conn. 616; Ricard vs. Williams, 7 Wh. 59, 115, 119.

17. In a suit against a stranger, heirs are not required to show that they have accepted a succession. Ware et al. vs. Jones, 19 An. 428; Edwards vs. Ricks, 30 An. 926.

18. Prescription against such acceptance can only be pleaded by a party who has held for the time of such prescription. C. C. 3503.

19. Laches can not be pleaded except by one to whom plaintiff owed a duty of which he was aware. And in Louisiana, knowledge of the facts makes no difference. C. C. 2295.

20. The voluntary purchaser at a judicial sale for purposes of profit is not more entitled to protection than the heir, who is brought in *in invitum.*

*Calhoun Fluker* for Defendant and Appellant:

1. The judgment of the parish court for Lafayette, in the Succession of Euphrosine Boisdoré, and the sale in pursuance of it, under which D. J. Wedge became the purchaser of the land claim, having been rendered and authorized by a court having jurisdiction, as shown affirmatively on the face of the record, can not be attacked in a collateral proceeding, but can only be annulled in a direct proceeding in the court that rendered such judgment and ordered such sale. Michel's Heirs vs. Michel's Curator, 11 La. 154; Lalanne's Heirs vs. Moreau, 13 La. 433; Ball's Admr. vs. Ball, 15 La. 173; Valdere vs. Bird, 10 Rob. 396; Beal. vs. Walden, 11 Rob. 67; Elliott vs. Piersol, 1 Peters, 340; Sizemore vs. Wedge, 20 An. 124; Wisdom vs. Buckner, 31 An. 58; Duson vs. Dupré, 32 An. 896; Starns vs. Hadnot, 42 An. 366; Starns vs. Goodwyn, 43 An. 304; Harvey vs. Tyler, 2 Wall. 328; Simmons vs. Saul, 138 U. S. 439; Grignon vs. Astor, 2 How. 340.

2. The defendant, J. L. Bradford, having in good faith, and for full value in open market and in the usual course of trade, purchased the land scrip in this case from the party to whom the proper officers of the United States had issued it, under an act of Congress making it assignable, and having located the same on the public lands of the United States and received United States patents in his own name, he is protected by the adjudications and acts of the officers of the Land Department, and the patents, even if the judgment and sale under which D. J. Wedge acquired his right were void; and the plaintiffs only have a remedy against the United States, as if no scrip had ever issued to said Wedge, and have no remedy against the purchaser and locator of the said scrip. Act of Congress of June 2, 1858, Sec. 3, 11th Stats. 294; Act of Congress of January 28, 1879, 20th Stats. 274; Regulations of Interior Department under above laws of February 13, 1879, Vol. 5, Copp's Land Owner, p. 181; Regulations of Interior Department of October 13, 1888 (copy in record before p. 1), and Vol. 15, p. 178, Copp's Land Owner; Opinion Attorney General United States of March 15, 1856 7th Opp. Attorney General, 657; Decision of Secretary of Interior of November 10, 1851; 1 Lester's Land Laws, Regulations and Decisions, 612; Decision of same, of March 20, 1852, do. p. 612; Decision of same of January 19, 1860, do. p. 621.

*Merrick & Merrick* on the same side:

It was error to refuse to compel numerous plaintiffs, vaguely claiming to be heirs of Euphrosine Boisdoré, who, they alleged, died more than seventy years ago, and who had left an unlocated land claim, which, after more than half a century, they alleged had been sold by the probate court of the parish of Lafayette to one D. J. Wedge, and which said sale was attacked by them, in their petition, on the grounds that Euphrosine Boisdoré's succession had been "accepted" by the heirs, and that she did "not die in and was not *then* domiciled in Lafayette parish," to amend and set forth in their petition in what manner and how they became such heirs, and to compel them, while they denied that Euphrosine Boisdoré died in Lafayette parish, where the succession was opened, to state in what parish said Euphrosine Boisdoré was domiciled when she did die. That it was error also to permit the plaintiffs to offer testimony of their heirship, thus keeping the defendant in the dark until their proof was all in, and then to allow them to file an amendment covering the proofs thus previously introduced.

2.  It was error, in this suit wherein plaintiffs charge defendant and D. J. W. with fraudulently obtaining a decree from a court without jurisdiction for the sale of a land claim, and also in the same petition declaring the defendant and D. J. W. to be *negotiores gestorum* and bound to convey the title the defendant had acquired from the United States government, to refuse to compel the plaintiffs to elect whether they would prosecute the suit as *ex quasi delicto* or *ex quasi contractu*, the two demands being inconsistent with each other. A party doing a wrong to and acting fraudulently against another, under our law can not be considered as holding the inconsistent position of acting as *quasi* agent and intending to confer a favor on the party he is purposely injuring.

3.  If Major Wedge was a *negotiorum gestor*, as alleged, then he applied to the public administrator in 1872 to provoke a sale, intending to benefit the plaintiffs, and the plaintiffs by setting up this claim ratify all his acts. By declaring him to be a *negotiorum gestor*, plaintiffs assert that his acts were lawful and intended to benefit them (R. C. C. 2293), and they must pay him his expenses, and his sale to this defendant stands ratified, and plaintiffs must call on Major Wedge, their *quasi* agent, to account. R. C. C., Art. 2299; 4 Pothier, Appendix, p. 296, No. 167, Ed. 1835. The rules relative to agency control the contracts of the *negotiorum gestorum* as to the rights and duties of the parties. R C. C. 2295, 2299; Mackeldey, No. 498, p. 237, Brussell's Ed. 1846; 4 Pothier, p. 185, No. 167; 2 Hemecius Recitationes, p. 283; C. M. L , XIX; 20 Laurent, No. 323.

    And the parties who claim the benefit of any part of the acts of the *negotiorum gestor* ratify all his acts. Elam vs. Carruth, 2 An. 275; 1 Parsons on Contracts, pp. 46, 47, Note W.; 2 Bouvier, Institutes, No. 1316, p. 25; Kellar vs. Ashford, 133 U. S. 610; 10 S. C. R. 496.

4.  But to constitute a party a *negotiorum gestor* he must intend to act for another and not for himself. Parties acting for themselves can not be charged as *negotiorum gestores*. If a man committs a trespass on another man's land that other can not allow nine years to elapse and then sue him as a *negotiorum gestor*. He must sue him within the time allowed for offences and quasi offences. R. C. C., Arts. 2315, 3536.

5.  As Major Wedge bought the claim at a probate sale clearly for himself and not for another, there could not have been the conditions asserted to charge himself as *negotiorum gestor*, and our laws will not create a chancery trust. 20 Laurent, Nos. 308, 310, 311; 20 Laurent, No. 321, p. 350; 4 Pothier, Appendix, p. 297, No. 169, R. C. C. 2293; R. C. C., Art. 1507.

6.  It was error, under the allegations of the petition, to permit a collateral attack on the title held under the patents from the United States by the defendant, and to allow testimony tending to show that the succession of one Euphrosine Boisdoré was opened by her death in the parish of St. Martin, for the purpose of depriving the patentee of the benefit of the lands granted him by the government of the United States, under the pretence that the probate court of the parish of Lafayette was without jurisdiction and that the officers of the government had erroneously considered the unreversed judgment of the probate court of the parish of Lafayette as valid.

7.  The act of Congress of 28th January, 1879, made these land warrants negotiable. The surveyor general had the power to declare who was entitled to the warrant. The land warrant itself, being in due form and by the proper officer, did not, on its face, inform the purchaser of any defect (if such existed), because the Supreme Court of the United States could not, with the warrant *spread out before it* in Simmons vs. Saul, 138 U. S., p. 441, have sustained the demurrer, if the

warrant, on its face, charged the buyer with bad faith. Therefore, the warrants bought by the defendant, in themselves, were valid and negotiable warrants. 11 U. S. Stats. at Large, chap. 81, p. 295, Secs. 3 and 4; 20 U. S. Stats. at Large, pp. 274 and 275, last clause Sec. 1, and Secs. 2, 3 and 4. And in Louisiana no man is obliged (in order to be in good faith) to trace his title to its source; otherwise the doctrine of the possessor in good faith would be useless. R. C. C., Arts. 3451, 3484; Montgomery vs. Whitfield, 41 An. 654; Gaddens vs. Mobley, 37 An. 419; Oriol vs. Moss, 38 An., p. 772, No. II; Barrow vs. Wilson, 38 An. 209; Patterson vs. Maloney, 38 An. 888, No III. And the patent having issued in good faith to the defendant for full value, must be held to have issued after all needful investigations had been made by the officers of the United States. Minter vs. Crommel'n, 18 How., pp. 87, 88 and 89; Fuentes vs. U. S., 22 H. 459. "Patent the superior and conclusive evidence of legal title." 13 Peters, 450; Bagnal vs. Broderick, 14 An. 77, 78; 3 An. 203; 13 An. 128; Smelting Co. vs. Kemp, 104 U. S. R. 647; Clements vs. Machebœuf, 92 U. S. 425.

8.  The system of laws in force in Louisiana is entirely distinct, independent and designedly exclusive of the English chancery system. The Constitution of 1812 for the express purpose of excluding the chancery system, declared that the " existing laws of this territory, when this Constitution goes into effect, shal continue to be in force until altered or abolished by the Legislature," etc. Const. 1812, Art. 4, Sec. 11.

Therefore, when our law speaks of deciding according to equity, it means the equity known to the civil law and expressly defined by Arts. 21 and 1965 [1960] of R. C. Code, and not the chancery law, which can have no force until adopted at length by the Legislature. See in extenso, 1 Domat, Tit. 1, Sec. 2, Book 1; also Resolution of the Legislature, 1841. No. 90, p. 72, Livingston vs. Story, 9 Peters, 654; Const. 1845, Art. 20; Const. 1852, Art. 120; Const. 1868, Art. 116. See also, 1 Hennen's Digest, pp. 795, 796, VIII. See Succession of Franklin, 7 An. 395, 396; Judges Rost and Eustis; also, 13 An. 283.

9.  The introduction of one branch of the chancery or common law against our constitutional prohibition would require the introduction of other necessary branches of the same law. Thus our law will not allow the recovery of real property, except the plaintiff produces the superior legal title. But in order to remedy the wrong arising from an eviction, the possessor can maintain himself in possession by the possessory action if he sues within the year, and compel the other party to show the legal title, but if he neglects to bring his possessory action within the year, our courts can not save him by an action of ejectment. At common law, in an action of ejectment (not writs formed on right) the plaintiff only has to show, in order to recover, a prior eviction within the twenty years. But he recovers no rents in that action, and is driven to bring another action for the mesne profits. Our law gives the rents and revenues as an incident of the action, and it seems refuses a separate action for the same. So, for example, chancery or equity relieves against payment of illegal interest, and will permit debtor to recover back the excess, even where the taking of the illegal interest occasions a forfeiture of debt and interest, but notwithstanding the forfeiture, the courts of equity will compel the debtor to pay the forfeited debt and the legal interest thereon, before it will enjoin creditor or compel him to refund the excess. Willards Eq., Rogers vs. Rathburn; 1 Johnson Chy. R. 367; Tupper vs. Powell, Ib. 437; Morgan vs. Schemerhorn, 1 Paige, 546.

10. The *negotiorum gestor* of the civil law and the party charged as trustee *in invitum* of the chancery law differs *toto cœlo*. In the first case the act from which the *negotiorum gestio* flows must be a *lawful* and purely voluntary act of the *negotiorum gestor*, intended for the benefit of another and not for himself. R. C. C., Arts 2298, 2295, 2298 and 2299. In the second case the chancery law in some cases charges a man as trustee against his will for his illegal acts, where he has taken upon himself no trust or duty toward the party to whom he is compelled to account. Willard's Eq., p. 249. Misappropriation of funds in buying real estate is a case of that kind. Such trusts, resulting trusts, do not exist in Louisiana and can not be introduced by deeds any more than by wills. Our courts have, in accordance with the Code and the Constitution and traditions of the law, resisted the introduction of any branch of the chancery law, which would, in order to prevent injustice, require the introduction of other branches of that law. Perrault vs. Perrault, 32 An. 635; Labouisse vs. Rope Co., 43 An. 245; Thibodaux vs. Anderson, 34 An. 797; Hackenburg vs. Gartscamp, 30 An. 898; Delop & Co. vs. Windsor, 26 An. 186, 187; Hughes Hyllstead & Co. vs. Klingender Bros., 14 An. 845; Marsh and Husband vs. Sevin, 28 An. 326; Heirs of Dohan vs. Dohan et al., 42 An. 452; McKenzie vs. Bacon, 40 An. 162; Badon vs. Badon, 4 L. R., 166; Muggah vs. Greig, 2 R. R. 590; Fuselier vs. Fuselier, 5 An. 132.

11. It can not be assumed without proof, upon mere general and vague allegations of fraud, without pointing at the specific acts of fraud, that the party has been guilty of fraud in buying property at a probate sale. Nor can he be deprived of his rights by a collateral attack on the decree of the probate court, in a suit in another jurisdiction between other parties. Starns vs. Goodwyn, 43 An. 304; Starns vs. Hadnot, 42 An. 369; Duson vs. Dupré, 320, 897, 898; Simmons vs Saul, 138 U. S. 437; 11 S. C. R. 369, and cases cited. See also, Windsor vs. McVeigh, 93 U. S. 279; 13 Wall. 166; Rocks vs. Williams, 13 An. 374; 47 Fed. Rep. 43; Stevens vs. Pinneo, 26 An. 618, bottom of page; Compton vs. Compton, 9 An. 499.

12. As the judges of the various courts of Louisiana are sworn to sustain its Constitution, which so jealously excludes the chancery law of the common law States, except by explicit legislative action, it may seem needless to observe that the plaintiff's case is without merit according to that system, for these among numerous other reasons, viz.:

(1) The defendant has an absolutely perfect title (the highest known to our law), and for which he paid value. Against this title no mere prior equity can prevail, and this title may be set up by plea and prevent all other investigations in the case. Mitford's Eq. Pleadings, p. 361. See also Cooper's Chancery Prac. 281; Story Eq. Pl., No. 805 (5).

(2) Plaintiffs have been guilty of gross laches, for if they had shown the slightest vigilance, defendant would not have been led to invest his money in these particular warrants. Badger vs. Badger, 2 Wallace, 94, 95 (69 U. S. 94, 95); Richards vs. Mackall, 8 S. C. R. 440; 124 U. S. 183.

(3) Defendant could only be declared a trustee and compelled, by the power of the chancellor, to convey by showing, by allegations and proof of specific facts (and not general allegations), that the *defendant himself* (and not some third party) had done some fraudulent acts which had prevented the plaintiffs from obtaining their legal rights, and in chancery a demurrer would be sustained to plaintiff's petition. Coal Co. vs. United States, 123 U. S. R. 317; 8 S. C. R. 131; Hunt vs. Hunt, 72 N. Y. 217, 225, 227; United States vs. Throckmorton, 98 U. S. 61, Syllabus No. 3, and pp. 65 and 66; United States vs. Hancock, 133 U. S. 193; 10 S. C. R. 264.

(4) A party can not benefit himself by a pretence of ignorance of the public "record and acts of Congress." United States vs. Flint, 4 Sawyer, 61, Mr. Justice Field.

13 The defendant is entitled to the benefits of his patents under the terms of the United States, vesting the lands in him, and the judgment of the lower court deprives the defendant of his rights by compelling him to convey the lands and pay the plaintiffs for those sold by him, as effectually as if the United States patents had been declared invalid by the court. Bagnell vs. Peters, 13 Peters, 450; Minter vs. Crommelin, 18 Howard, 87, 89; United States vs. Stone, 98 U. S. 235; Murray, Lessee, vs. Hoboken Land Co., 18 Howard, 284, 285.

The judgment, inasmuch as it decrees the defendant a third party, having no privity with the plaintiffs to convey his lands held by him under the patents of the United States to them, is a form of administration of justice unknown to our law and illegal. See Pothier on Obligations, Part 1, Chap. II, Nos. 157 and 158, Paris Ed. 1835, Dupin.

Inprisonment for debt has been abolished, and the power to compel a defendant by imprisonment to comply with a decree violates the spirit of the law.

14. WHERE THE PLAINTIFFS' CASE IS DEVOID OF EQUITY, because it is an attempt to enrich themselves at the cost and expense of an innocent third party, the courts will not assist them. R. C. C. 1965 [1960]. Plaintiffs' supposed land claim being of so little value, these lands could easily have been entered for twelve and a half cents per acre (10 U. S. St. at Large, 574), that it was abandoned for more than fifty years, and eighteen years after the probate sale, seventy years after the death of intestate, the plaintiffs refusing to repay $40, the full value paid for the claim at probate sale, the cost of traveling expenses, the cost of retaining counsel at Washington, the cost paid (viz., $500) in open market by defendant in good faith for the warrants, the $22.09 paid the government of the United States for excess of land, and then charging defendant $315.21 for the lands he had bought and given in order to get those land warrants held by him properly located, is a case wanting in equity, both under the system of the common and civil law, and can not be enforced.

The opinion of the court was delivered by

WATKINS, J.   This is a petitory action in ordinary form, instituted by certain persons alleging themselves to be the heirs of Euphrosine Boisdoré, widow of Francois Grevemberg, deceased, for the recovery of a tract of land situated in the parish of St. Landry, *quoad* that portion held by him at date suit was filed, and for the avails of such portion thereof as had been theretofore sold by him.

The plaintiffs' claim of title may be stated in this wise, viz.:

That Euphrosine Boisdoré died in the parish of St. Martin, this State, in the year 1818, and upon an inventory of the property of her estate, taken in the following year, was scheduled "by way of a memorandum," a land claim for 800 arpents (of land), or 686.56 acres, situated in the old county of Attakapas.

That this claim was acquired by him under a Spanish grant, or order of survey, during the year 1781, prior to her marriage, and it was subsequently and regularly listed by the register and receiver of the United States Land Office in their report, as land commissioners, to Congress, on 30th of December, 1815, and was thereafter confirmed to her by act of Congress in 1825.

This claim was not satisfied by survey, or location in place, and no provision was made looking to the satisfaction thereof, until, by act of Congress passed on June 2, 1838, the surveyor general was authorized to issue " to the claimant, or her legal representatives," of such land claim a certificate of location or land scrip for the number of acres called for, which was locatable on any public lands of the United States, at any land office in the United States.

That the *immediate* heirs of Euphrosine Boisdoré died in 1857 and 1864, respectively, and two of her grandchildren died in 1836 and 1864, respectively—the third and only grandchild now surviving—and that none of said children and heirs at any time applied for or secured scrip under the act of 1858, or procured any other satisfaction of said land claim.

Nothing further appears to have been done in the premises until, during the year 1872, said land claim was adjudicated to one D. J. Wedge at public judicial sale, made in the succession of Euphrosine Boisdoré, in the parish of Lafayette, on the 29th of August.

Claiming thereunder to be, *quoad hoc*, the legal representative of said claimant, this adjudicatee applied to the surveyor general for *land scrip* in satisfaction of said *land claim*, in pursuance of the provisions of the Act of June 2, 1858, and same was accordingly issued and delivered to him on the 27th of October, 1887.

This scrip was duly certified by the commissioner of the general land office on November 16 of same year, and on the 8th of December following the surveyor general certified it and endorsed thereon that " by reason of the evidence on file in my (his) office, Daniel J. Wedge is the legal representative of the confirmee, and, as such, is entitled to locate the within certificate."

On the 12th of December following, Wedge assigned the land scrip thus endorsed to the defendant, Bradford, and for which he obtained patents to the lands in suit on the 27th of October, 1888.

That those patents substantially recite that they are in full satisfaction of the unsatisfied claim of Euphrosine Boisdoré, and of the

land scrip issued in satisfaction thereof, in pursuance of the act of Congress of date June 2, 1858, and that they evidence the title of the defendant, Bradford, assignee of D. J. Wedge, representative of Euphrosine Boisdoré, deceased.

We have premised this much of the *undisputed* facts of this case, so that the demands of the plaintiffs, and the exceptions and answer of the defendant might appear more striking and distinct.

Plaintiffs representing themselves to be the lineal descendants of Euphrosine Boisdoré—about twenty-five in number, and for the greater part residing in parishes of this State, in the vicinity of Lafayette parish—came into the Civil District Court of the parish of Orleans, upon demands against Bradford *alone*, not making Wedge a party, and averring that they never applied for nor received certificates of location in satisfaction of the land claim of their ancestrix, Euphrosine Boisdoré, but remaining in ignorance of their rights until within the year last past (1889) they sought the advice of counsel, and instituted this suit.

In their petition they make the following averments and representations, viz.:

" That for the reasons heretofore stated, the heirs of Euphrosine Boisdoré accepted her succession; and *because she did not die and was not domiciled in Lafayette parish * * the said parish court was without jurisdiction to open her succession,* and that all proceedings in said court in that behalf, and all orders therein made, are and were *absolutely null and void;* and that the sale made by the said sheriff to said Wedge thereunder was not preceded by the formalities prescribed by law." (Italics ours.)

Further, "that said proceedings were *absolutely null and void, and that the absolute nullity of said proceedings was* (and is) *patent upon the face thereof,* and that the defendant, *Bradford, was bound to take notice of* (the) *petitioners' rights in the premises,* and was bound to *take notice of the nullity of said pretended probate proceedings* in said parish court, so, as aforesaid, *patent on the face thereof, and of the total lack of jurisdiction in said court in the* matter of said succession." (Italics ours.)

On the foregoing theory and averments plaintiffs allege that they have a right " to claim the benefit of said certificates * * * and to be decreed the joint owners of the land located therewith."

The foregoing are supplemented by the following averments, viz.:

"That, notwithstanding the nullity of said probate proceedings, * * * and the sale made thereunder, they *had* the right to hold said Wedge as their *negotiorum gestor,* and to claim said scrip so obtained by him; and they *have* the right to hold said Bradford as such *negotiorum gestor,* and to claim the lands located by him with said scrip."

Upon these averments plaintiffs pray "that there be judgment in (their) favor, declaring that said proceedings in the parish court of the parish of Lafayette, pretending to open the succession of Euphrosine Boisdoré, *are absolutely null and void for want of jurisdiction in said court in the premises;* and that all orders therein made, and thereunder the sale of said land claim to said Wedge, *are and were absolutely null and void and without effect to vest any title whatever in him;* and that the defendants took said *scrip* with full knowledge of the nullity of said proceedings, and that he acquired no title thereto by an assignment thereof to him by said Wedge," etc.

To this petition defendant tendered an exception to the effect that plaintiffs' averments were bad for duplicity and inconsistency, and ruled them for cause why they should not be compelled to elect whether they would pursue their allegations *ex delicto* in *disaffirmance* of said probate proceedings, or those *ex contractu* in *affirmance* of them.

This exception having been overruled and a bill of exception thereto reserved, defendant filed an answer in which he plead the prescription of one (1), five (5) and ten (10) years and the general issue, supplemented by the following special defences, viz.:

That the land claim of Euphrosine Boisdoré was of little value at the date of the probate proceedings in 1872, and for many years thereafter, and that the plaintiffs and their authors "have been guilty of such *laches* and gross neglect of said claim that they have no just right thereto, and have no right to speculate upon (such) *laches* and negligence, and avail themselves of money and labor expended by others," and to recover property to the acquisition of which they have contributed nothing.

He further represents that had the plaintiffs been mindful of their supposed rights, they could at any time between August, 1872, when said *land claim* was adjudicated to Wedge, and the 27th of October,

1887, when the surveyor general issued *land scrip* therefor, have appeared and set up claim thereto, as the legal representatives of Euphrosine Boisdoré, and contested Wedge's right thereto before the officers of the Interior Department of the United States government—same being, at that time, a matter of which such department had undoubted jurisdiction.

That having failed to take timely and proper steps, in that regard, antecedent to the issuance of patents to him, predicated upon the *scrip* he surrendered, this inquiry can not be gone into now, and he be deprived of the *property*, his title to which is evidenced by such patents.

Accepting plaintiffs' theory of the case, the judge *a quo* rendered judgment in their favor in conformity to their prayer, and the defendant has appealed.

## I.

The defendant's exception is suggestive of some embarrassment in the discussion and decision of this case, of which we consider it important that it be relieved preliminarily.

We take it to be clear and undoubted that this is a petitory action of ordinary form, in which it became necessary for the plaintiffs to to set up the *absolute nullity* of the probate sale to Wedge, of the Boisdoré land claim in 1872, and the consequences flowing therefrom, in order to remove an apparent obstacle to their recovery of the property from Bradford, as Wedge's assignee of the land scrip, which he gave in exchange for patents.

This is not, in any sense, an action of nullity or rescission, seeking the help of a judicial decree revoking an illegal sale. Such sale and proceedings are only collaterally drawn in question, and plaintiffs' full reliance is placed upon the Boisdoré succession records, to exhibit and prove the want of jurisdiction in the probate court of Lafayette parish to grant the order of sale, and the consequent absolute nullity of Wedge's title to the land claim.

The difficulty suggested by defendant's exception is that, while adhering to their charges of absolute nullity, plaintiffs' contention is that they *had* " a right to hold said Wedge as their *negotiorum gestor* and claim said scrip," and that " they *have* the right to hold said Bradford as such *negotiorum gestor*, and to claim the lands located by him with such scrip "—thus placing themselves in the position of asking this court to find and decree the nullity of a judicial sale, and

in the same judgment to decree them entitled to its avails; asking us to declare Wedge to have been their *negotiorum gestor* throughout the whole course of his negotiations with the officers of the land department in securing scrip in settlement of the Boisdoré land claim; and at the same time to declare that the defendant, likewise, became their *negotiorum gestor* in obtaing the scrip from Wedge, and that he acted as such in obtaining patents in his own name, in the face of allegation and proof that their alleged *negotiorum gestor*, Wedge, had made an assignment of scrip standing in his name to the defendant Bradford for a consideration.

This embarrassment is increased when the fact is taken into consideration that Wedge has not been made a party to this litigation; that no judgment is asked requesting the revocation of the acts and contracts of these two *negotiorum gestores;* and that this suit was brought and decided in a jurisdiction wholly different from that of Wedge's domicile, as well as that of the succession of Euphrosine Boisdoré, whether in St. Martin or Lafayette parish.

These various positions seem to us to be altogether incompatible with each other, but, as the district judge left them undisturbed, and preferring to try the case as a unit, we will simply adopt the course he pursued, and treat the issues in detail as they occur, chronologically.

II.

Addressing ourselves to the questions appertaining to the nullity of the Lafayette probate sale in 1872, we have examined the transcript, and reproduce therefrom the following summarized statement of facts, viz. :

The petition of the public administrator of the parish of Lafayette avers " that Euphrosine Boisdoré *departed this life in said parish (of Lafayette) many years since*, leaving some property, consisting of an old deferred private claim (for) lands against the government of the United States, as shown by the reports of the register and receiver etc. ;" and it further avers' " that said property should be inventoried, appraised and sold according to law;" and thereupon said administrator prayed for an order of court directing and requiring " that the property be sold according to law to pay debts," etc.

The judge of the parish court, exercising probate jurisdiction, entered up an order directing that said public administrator "after ten days' notice, if there is no opposition, take charge of said estate

and administer it according to law." He further ordered "that after legal delays and advertisement, the property appertaining to the estate *be sold for the purpose of paying debts* and settling the succession."

Subsequently, and in due form of law, an inventory was taken of said property, and same was duly advertised for sale, and adjudicated to D. J. Wedge for cash, at the full amount of its *appraised* value, and a *process verbal* was duly executed and properly filed in the clerk's office.

The evidence of the Boisdoré land claim physically and actually passed into the *possession* and under the control of the adjudicatee, at the price of $40, the valuation fixed in the inventory by two sworn appraisers, and which amount is neither alleged or shown to have been an undervaluation thereof.

These are the facts exhibited on the *face* of the Boisdoré *mortuaria* in Lafayette parish, upon which we are requested to maintain and decree the *absolute* nullity of Wedge's title, in this collateral action.

Not content with this showing, however, the plaintiffs introduced as their witness the present clerk of the court of the parish of St. Martin, who, in the course of his testimony, made the following statements, viz. :

"Q. Have you made search for the record of the succession of *Euphrosine Boisdoré* ?

"A. Yes, sir.

" Q. Did you find the record of the succession of *Euphrosine Boisdoré* amongst the records of your court?

"A. I find what I have of the succession of *Francois Grevemberg, and nothing entered in the name of Euphrosine Boisdoré in the records of my office.*" (Italics ours.)

Upon further interrogation, and having his memory refreshed by the exhibition to him of some *loose papers*, fragmentary in character, he said that upon a very *careful search* amongst the archives of his office, he found what appeared to be a *proces verbal* of an *inventory* and a *marriage contract*, and added: " but nothing more having *reference* to the estate of *Euphrosine Boisdoré*, except the file I hold here, marked No. 316, *Estate of Widow Francois* Grevemburg, 1819."

It was upon this inventory that the *memorandum* entry of the Euphrosine Boisdoré land claim appears to have been entered as above stated.

In addition to the. foregoing, there are a few parol statements made to the effect that *Euphrosine Boisdoré lived and died in the parish of St. Martin;* but amongst the oldest members of the family who were interrogated as witnesses, there was an old lady of seventy-eight (78) years of age, who stated that she once saw Euphrosine Boisdoré, who was her grandmother, and that she died soon afterward. She must have been but a little girl then, as she must have been born in 1812, and was, consequently, but six (6) years of age at the date of her grandmother's death in the year 1818.

This circumstance is cited for the purpose of illustrating how desultory the proof is on this score:

Of the testimony it may be fairly said that it leads to the *inference* of Euphrosine Boisdoré having resided and died in the parish of St. Martin, but it does not *prove it fully,* nor does it clearly establish the fact that an *actual administration of her estate* was ever *commenced* in that parish, much less does it prove the *commencement and termination thereof in that parish,* by an acceptance by the heirs of the deceased or otherwise.

It is a noteworthy fact that in the plaintiff's *original* petition no mention is made of the residence of any one of the twenty-two (22) heirs of Euphrosine Boisdoré who instituted this suit, and it was only in response to an exception of the defendant that plaintiffs filed a supplemental petition setting forth their various places of present residence—further illustrating how obscure and scarce are the facts on which plaintiffs place reliance for the overthrow of the jurisdiction of the court of Lafayette parish in 1872; *even* if it be conceded to be perfectly competent evidence in such a proceeding as this.

Accepting the situation of affairs to have been as above outlined, and what was the exact *status* of the jurisdiction of the parish court of Lafayette parish, in 1872, in respect to the succession of Euphrosine Boisdoré?

It appears from an authoritative publication of the statutes and resolves of the legislative session of the General Assembly of this State, for the year 1823, that an act was passed thereat creating "a new parish in the county of Attakapas to be called the parish of Lafayette," section one of which declares "that the parish of St. Martin is, and shall be by the present act, *divided, and a new parish formed out of the western part of the said parish, which shall be called and known by the name of the parish of Lafayette.*" (Italics are ours.)

Grevemberg et ais. vs. Bradford.

Amongst other things needful for the complete and perfect organization of the *new* parish, the act provided for the election of certain officers, the establishment of a court house, and for the administration of justice therein, so as to make it a complete and perfect political entity in all respects. Adams vs. Forsyth, 44 An. 140.

In pursuance of this theory, the act in its 9th section declares " that, as soon as the said *parish of Lafayette* shall be established * * * it shall be the duty of the *clerk of the court of the parish of St. Martin* to transmit *to the clerk of the court of the parish of Lafayette all* the papers, documents, *and other judicial proceedings unfinished*, which may be in his office, and which *from the residence of the defendant*, and the *situation of the parties, belong to the parish created by this act.*"

It is evident that from a fair and reasonable interpretation of this section of the act, that unfinished and incompleted *mortuary proceedings* were contemplated by the term "*other judicial proceedings unfinished;*" and it seems quite clear that such unfinished and incomplete mortuary proceedings in the court of St. Martin, as those in which persons who were domiciled in the new parish might have an interest, were contemplated by the phrase "from the *situation of the parties, belong to the parish created by this act.*" (Italics ours.)

Reading the petition of the public administrator of the parish of Lafayette in the light of this statute, his declaration "that Euphrosine Boisdoré departed this life *in said parish* (of Lafayette) *many years ago*," seems quite suggestive of that court having jurisdiction of her succession; and when we take into consideration the orders of the judge, made on the faith of that declaration, directing the public administrator to "take charge of said succession and administer it according to law," that suggestion becomes convincing proof, and gives substantial support to his further order directing the sale of the land claim "for the purpose of paying debts," etc.

That upon this state of the *then* existing law, and in view of the *status* of the succession of Euphrosine Boisdoré at that time, the probate judge of the parish of Lafayette had authority to grant *that* order of sale, in the exercise of jurisdiction his court possessed over said succession, is a conclusive presumption of law, so far as this case is concerned, we can not doubt, nor can it be successfully denied.

The Legislature of 1823 was fully competent to deal with the ques-

tion in hand, and no one doubts its constitutional authority to thus alter and change the jurisdiction of courts, so as to transfer "judicial proceedings unfinished," into the courts of the territory in which the litigants were to reside thereafter, and which, "from the situation of the parties, belongs to the parish thus created."

This identical question arose and was decided in the case of Beale vs. Waldon, 11 R. 68, the controversy being whether the probate court of the parish of Jefferson had jurisdiction to order a sale of property therein situated *at the time*, though previously forming a part of the territory of the parish of Orleans, from which the parish of Jefferson had been taken, and wherein the succession of the deceased had been opened, and, upon the authority of two previous decisions, Palouette vs. Palouette, 2 La. 270, and Forestall vs. Forestall, 4 La. 214, and the court said:

"The succession of Thomas Beale, senior, was opened, in a legal sense, by his death, which took place in the parish of Orleans before its division. If the court of probates had already taken cognizance before the parish of Jefferson was cut off, its jurisdiction was not divested by the separation."

That case would appear to be conclusively in favor of the plaintiffs if it be conceded that Euphrosine Boisdoré's succession was once under administration in the parish of St. Martin antecedent to 1823; and, indeed, it would be, but for the fact that is stated by the court that the act of February, 1825, creating the parish of Jefferson, does not contain any "provision relating to a transfer of causes pending in the courts of the parish of Orleans to those of the new parish, nor relative to administration of successions already opened before the separation of the two parishes."

But, as we have already seen that the act creating the parish of Lafayette does contain such provisions, the supposed *partial* administration of the succession of Euphrosine Boisdoré in the parish of St. Martin *did not prevent* the acquisition of jurisdiction by the probate court of the former, to continue and terminate said administration, but, on the contrary, expressly sanctioned it.

Act 39 of 1871 creating and providing for the organization of the parish of Red River, and the supplemental Act No. 78, of 1873, containing similar provisions to those of the act of 1823 creating the parish of Lafayette, were construed in Hamnest vs. Sprowl, 31 An. 325, and therein the court maintained the jurisdiction of the court of

the *new* parish to try and decide a suit to revive a judgment anciently rendered in the parish of Natchitoches, from which a portion of its territory had been taken in its formation—the court basing its decision on the ground that the statutes referred to " put the Red river court in the place and stead of the Natchitoches court; vesting it, as regards the judgment, with the jurisdiction of the latter," considering " the proceeding to revive a judgment, not as a new suit, but simply as a proceeding in the same suit to continue and keep alive a judgment rendered therein, and to furnish proof that it has not been satisfied or extinguished."

Even so, under the terms of the act creating the parish of Lafayette, was the probate court thereof vested with complete jurisdiction of the unfinished gestion of the Euphrosine Boisdoré succession, who apparently resided in that portion of the territory of the ancient parish of St. Martin which was embraced therein.

The case of Duson vs. Dupré, 32 An. 896, was a petitory action instituted by plaintiff as curator of the succession of LeBlanc, to which the defendants excepted on the ground that the order of his appointment by the parish court of the parish of St. Landry was a nullity because " Louis LeBlanc having died in the parish of Orleans where he resided, the probate court of St. Landry had no jurisdiction over his succession." That exception was sustained in the court below, but in this court the judgment was reversed, the court expressing the following view, viz.:

" Defendants' position could be maintained if the appointment of the curator was absolutely void, *and the nullity apparent on the face of the papers and pleadings.*     *     *     *     *     *     *

" The late parish court had probate jurisdiction, and was exclusively competent to grant letters of administration in all successions properly opened in that court. Defendants contend that this succession was not properly opened in that court, for the reasons urged in their exceptions. This denial presents a question of fact, that the deceased was not a resident of this parish, etc.     *

*     * These questions can be looked into and adjudicated upon only in a direct action, *before the same court,*" etc.

That decision is but the reannouncement of what is the settled jurisprudence of this court, and it is perfectly conformable to the views hereinabove expressed.

Evidently, had Duson, curator, made a sale of the property of

27

the LeBlanc succession in the parish of St. Landry, and the heirs had contested the validity of the title conferred on the purchaser, who, like the present defendant, was a stranger to the succession, this court, acting on the authorities therein cited, would unquestionably have denied their action and affirmed the validity of the sale.

The principles of law recognized in the cases cited were recognized and applied by the Supreme Court, speaking through Mr. Justice Lamar, in the recent case of Simmons vs. Saul, 138 U. S. 441.

That was a suit in equity brought in the Circuit Court for the Eastern District of Pennsylvania, by citizens of Louisiana, Mississippi and Texas, claiming to be the legal descendants of Robert Simmons, late a citizen of Louisiana, against H. R. Saul, a citizen of Pennsylvania. Its object was to charge the defendant, as the former owner of a tract of land in Wisconsin, *as a trustee for complainants* with respect to said ownership and have him account for the *value* of the lands, their rents and profits, and for loss and damage resulting from the cutting and removal of timber therefrom. The bill represents that Simmons died intestate in the parish of Washington, Louisiana, seized and possessed of an inchoate land claim in the parish of St. Tammany, for 640 acres, founded upon the purchase of a settlement right which was confirmed by the Act of Congress of March 3, 1813, but remained unlocated until subsequent to the passage of the Act of Congress of June 2, 1858—the identical act under which the Boisdoré land claim, of identically similar character, was located.

It further represents that precisely similar probate proceedings were inaugurated in the parish of Washington, whereby said land claim was adjudicated in the year 1872 at a public judicial sale, for the alleged purpose of paying debts of the succession, the price paid being $30 in cash, which was consumed in the payment of costs.

That thereafter said purchaser presented this land claim thus acquired, acting as the legal representative of Simmons, to the surveyor general for certificates of location, and same were issued and duly approved by the commissioner of the general land office, and delivered to him; and thereafter he located them upon the lands in controversy, situated in Wisconsin, for which patents regularly issued " in the name of Robert M. Simmons, or his legal representatives."

Those lands were subsequently acquired by *mesne* conveyances from said adjudicatee by the defendant.

To the averment of nullity of all of said probate proceedings and sale, had in and entertained by the parish court of Washington parish for want of jurisdiction, the defendant demurred on the ground that the relief demanded " is barred by the judgment or decree of a court of competent jurisdiction, rendered in proceedings regular on their face, and which have not been attacked by any proceeding in *that* court, or in any appellate court."

The court below sustained this demurrer and dismissed the complainants' bill, and the latter appealed.

Thus paraphrased, the Simmons case appears to be an exactly parallel case to the instant one—excepting the solitary question of the decedent's disputed place of domicil and death.

First reciting the provisions of the various articles of our Civil Code and Code of Practice applicable to the administration of small successions, the Supreme Court said:

" The general principles of probate jurisdiction and practice, as settled by a long series of decisions in State courts and in the courts of the United States, are applicable to the powers and proceedings of the parish courts of Louisiana, and have been recognized and enforced by the Supreme Court of that State. They, also, show that under the averments of the bill the parish court of Washington parish had jurisdiction of the succession of Robert Simmons.

" The succession had been open for over forty years, and no one had claimed it; nor did any of the complainants, as heirs, accept it expressly, in writing or by judicial proceeding; nor tacitly, by doing any act which necessarily supposed their intention to accept. It was properly adjudicated to be vacant, and was administered as such.  *    *    *    *    *    *    *    *    *    *    *

"The petition, in reciting that Robert M. Simmons departed this life in said parish many years since  *   *   *   leaving some property, consisting of an old, deferred, unlocated, private land claim  *   *   *   set forth the necessary jurisdictional facts to warrant the court in proceeding to administer the estate."

On this statement of fact, and those conclusions of law, the court said:

" It is our opinion that the parish court of Washington parish had

a clear and unquestionable jurisdiction of the intestate estate or succession of Robert M. Simmons, and affirmed the judgment.''

As authority for that opinion the court cited and relied upon several preceding and pertinent decisions of that tribunal, and notably that of Comstock vs. Crawford, 3 Wall. 396, a case involving the validity of an administrator's sale in Wisconsin, of the authority of the court to order which, they said:

'' It is well settled that when the jurisdiction of a court of limited and special authority appears upon the *face* of its proceedings, its *action* can not be collaterally attacked for mere error or irregularity. The jurisdiction appearing the same presumption of law arises that it was *rightly exercised* as prevails with reference to the action of a court of superior and general authority.''

Also upon McNite vs. Turner, 16 Wall. 352, a like case, in which they said:

''Jurisdiction is authority to hear and determine. It is an axiomatic proposition that where jurisdiction has attached, whatever occurs or may subsequently occur in its exercise, the proceeding, being *coram judice*, can be impeached collaterally only for fraud. In all other respects it is as conclusive as if it were irreversible in a proceeding for error.''

Also Grignon's Lessee vs. Astor, 2 How. 319. Their review of authorities on this question is concluded by a reference to the case of Lalanne's Heirs vs. Morian, 13 La. 433, cited *infra*; also Pintard vs. Deyris, 3 New Series, 32; Beale vs. Waldon, 11 R. 67 and Sizemore vs. Wedge, 20 An. 124, and various other like cases, but particularly emphasizing the case of Duson vs. Dupré, as '' a case of great importance in this connection,'' quoting with approval the paragraph we have cited above.

This case is referred to as illustrating the fact that the courts of other States have, as well as the Supreme Court of the United States accepted the decisions and jurisprudence of this court, in reference to the effect of decrees and orders made and granted by the inferior courts of this State, in successions under their control; and, maintaining their jurisdiction as appearing on the face of the record, have upheld titles of purchasers thereunder as valid and legal—and in cases precisely similar to this one.

The case of Weeks vs. Railway Company, 47 N. W. Reporter, 737, presents a case quite similar to this, in which a land claim in favor

of a certain deceased citizen of the parish of St. Tammany was involved; the land scrip issued in exchange for which having been located on lands situated in the State of Michigan, and the plaintiffs setting up the identical claim the plaintiffs do here, the defendant claiming title by *mesne* conveyances founded previously, upon similar probate proceedings and sale of the land claim in the parish of St. Tammany, as those had in Lafayette. But all the mention that is made of the proceedings in, or the jurisdiction of the probate court of St. Tammany parish is " that the complaint sets out *sufficient* to show that said court had no jurisdiction of said estate of said deceased and that the whole proceedings were a fraud upon the rights of the plaintiffs.'' *But none of the facts are stated.*

Of course, on that hypothesis judgment went in favor of plaintiffs.

Walker vs. Daly, 49 Northwestern Rep. 812, is quite a similar case, arising upon a similar state of facts and proceedings in the parish of St. Tammany, Louisiana, with the material distinction that it is alleged therein that the land claim was *not the property of the person whose succession was administered.*

Of course that was quite sufficient to justify a judgment for plaintiff.

The case of Hardy vs. Hardin, 4 Sawyer, 536, practically rests upon the declaration of the court that a prefect under the Mexican government in California had no jurisdiction over the estates of deceased persons, or authority to appoint an administrator, and that the confirmation of a land grant inured to the benefit of the confirmers.

But, however pertinent those cases may be to the case in hand, they must yield to the paramount authority of Simmons vs. Saul and the established jurisprudence of this court.

### III.

Having ascertained that the probate court of the parish of Lafayette in 1872—and it is not doubted and can not be disputed that parish courts had unlimited jurisdiction under article eighty-seven (87) of the Constitution of 1868, in all succession and probate matters—had apparent jurisdiction of the succession of Euphrosine Boisdoré, what is the effect that must be given to the order of sale thereon granted by the judge, in respect to the title of Wedge as adjudicatee of the Boisdore land claim? The authorities are uniform

and our own jurisprudence is consistent and emphatic to the effect that such a decree must stand, and is entitled to the respect and observance of all those whose interests may be affected by it until same is set aside in the due course of law.

The sanctity and authenticity of judicial sales founded upon orders of competent courts is so clearly defined and the principle involved so well stated in Lalanne's Heirs vs. Morian, 13 La. 431, we will quote it as concisely announcing our views:

"We place our decision," say the court, "on the broad ground that sales directed and authorized by courts of justice are judicial sales to all intents and purposes," and in treating of their effect they further say: "the necessity and wisdom of such a rule of property has long been felt and acknowledged in the most important States of the Union, and none is better settled by the decisions of their courts.

"They all maintain that a purchaser under a decree of the orphans' court is bound to look to the jurisdiction, but the matters *within* that jurisdiction can not be disputed. That the decree of the court is to be received as conclusive evidence, not to be impeached from *within*, and, like all other acts of the highest judicial authority, impeachable only from *without;* and that a judgment, decree, sentence, or order passed by a competent jurisdiction, which creates or changes a title, or any interest in an estate, is not only final as to the parties themselves, and all claiming under them, but furnishes conclusive evidence to all mankind that the *right or interest belongs to the party to whom the court adjudged it.*

In many different forms of phraseology this principle has been, in many subsequent decisions, announced, but in none has it been more correctly or forcibly expressed.

In Sizemore vs. Wedge, 20 An. 124—a very similar suit—the court expressed itself thus:

"The purchaser at a probate sale, which is a judicial sale, is not bound to look beyond the *decree* recognizing its necessity. The jurisdiction of the court is an essential inquiry, but the *truth* of the record concerning matters within its jurisdiction can not be disputed."

In Woods vs. Lee, 21 An. 505; Webb vs. Keller, 39 An. 55; Linman vs. Riggins, 40 An. 764, and in many other cases, this court has consistently and rigorously adhered to that principle.

It was recently applied by us in a very similar case, Gale vs. O'Connor, 43 An. 717, and same was repeated in Succession of Thize, 44 An. ——, citing many previous cases; and amongst others the cases of Dumestre's succession, 40 An. 57, and Succession of Lehman, 41 An. 987, were quoted with approval.

This doctrine is likewise cited and relied upon in Simmons vs. Saul as the epitome of Louisiana jurisprudence on this question.

On reason and authority we are of opinion that the case is with the defendant; that on the face of the record and *mortuaria* of the parish of Lafayette the parish court of that parish in 1872 had probate jurisdiction of the unfinished gestion of the succession of Euphrosine Boisdoré; that the order of that court directing a sale of property of that succession to pay debts is *prima facie* valid and jurisdictional; that. the sale thereunder conveyed a fee simple title to the purchaser; and that said proceedings and sale must stand until, in some direct proceeding in the courts of the parish of Lafayette, the recitals thereof are proven untrue, and annulled and set aside.

Entertaining this view we must reverse the judgment appealed from.

It is therefore ordered, adjudged and decreed that the judgment and decree pronounced by the court *a quo* be and the same is annulled and reversed; and it is further ordered and decreed that the demands of the plaintiffs be rejected at their costs in both courts— their rights being reserved in a different form of action in a competent court.

Rehearing refused.